# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 17-2026V
(not to be published)

| | | |
|---|---|---|
| DANIELLE GILMORE, | * | Special Master Corcoran |
| | * | |
| Petitioner, | * | Filed: February 26, 2019 |
| v. | * | |
| | * | Decision Without Hearing; |
| SECRETARY OF HEALTH | * | Dismissal; Autism Spectrum |
| AND HUMAN SERVICES, | * | Disorder ("ASD"). |
| | * | |
| Respondent. | * | |

*Danielle Gilmore, pro se*, Bradenton, FL.

*Lara Englund,* U.S. Dep't of Justice, Washington, DC, for Respondent.

## DECISION DISMISSING CASE[1]

On December 26, 2017, Danielle Gilmore, on behalf of her son, H.G., filed a petition seeking compensation under the National Vaccine Injury Compensation Program (the "Vaccine Program").[2] In it, she alleged that the Diphtheria-tetanus-acellular pertussis ("DTaP"), Hepatitis B, Hib, Inactivated Polio ("IPV"), pneumococcal, and influenza ("flu") vaccines H.G. received on January 13, 2015, caused him to experience eczema, atopic dermatitis, and thereafter to develop

---

[1] Although this Decision has not formally been designated for publication, it will be posted on the Court of Federal Claims's website in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). **This means the Decision will be available to anyone with access to the internet.** As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the decision's inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the Decision in its present form will be available. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended, 42 U.S.C. §§ 300aa-10 through 34 (2012) [hereinafter "Vaccine Act" or "the Act"]. Individual section references hereafter will be to § 300aa of the Act.

an autism spectrum disorder ("ASD"). Petition at 1.

After medical records were filed, Respondent filed his Rule 4(c) Report, which included a motion to dismiss the petition – for failure to substantiate an association between H.G.'s vaccinations and his skin conditions, and also because the claim pursues the kind of autism injury claim that has repeatedly been rejected in the Vaccine Program. *See* Respondent's Rule 4(c) Report, filed on October 31, 2018 (ECF No. 18) ("Mot."). Shortly thereafter, I issued an order directing Petitioner to respond to the motion. *See* Order, dated November 1, 2018 (ECF No. 19). Petitioner filed a responsive brief in December 2018, attempting to support her claim. *See* Brief, filed December 19, 2018 (ECF No. 23) ("Opp."). Now, having reviewed the filed medical records and the parties' respective briefs, I hereby GRANT Respondent's motion to dismiss the claim.

I.  **Factual Background**

H.G. was born on July 11, 2014 – making him approximately six-months old at the time of the January 2015 vaccinations at issue. Ex. 10 at 1. Between his date of birth and January 2015, he received earlier doses of several of the vaccines alleged to have harmed him (i.e., Hep B, DTaP, Hib, IPV, and pneumococcal). Ex. 1 at 1-2.[3] He had several well-child visits in the fall of 2014, and at all was deemed to be developing normally. *See, e.g.*, Ex. 1 at 114, 121-23; Ex. 2 at 2. However, H.G. was taken to the emergency room on October 10, 2014, and at a follow-up visit with his pediatrician the next day was assessed with a rash. Ex. 1 at 119-20. He also displayed dry spots on his skin at the pediatric visit on January 13, 2015, when he received the vaccines that are the basis for this claim. *Id.* at 124-26.

Nine days later, on January 22, 2015, H.G. was taken back to his pediatrician based upon a red spot on his right cheek that had existed for two weeks (which if so would place its onset *before* the vaccinations). Ex. 1 at 127-28. He was assessed with impetigo and atopic dermatitis. *Id.* The following week, he was brought back after his symptoms worsened, and was thereafter referred to a dermatologist. *Id.* at 129-31. H.G. saw the dermatologist on January 29, 2015, at which time Petitioner reported an onset in early January (thus again preceding the vaccinations). *Id.* at 179-80. The dermatologist diagnosed H.G. as having impetigo on his face and eczema elsewhere on his body. *Id.* at 180.

H.G. continued to see the same dermatologist in the following months, and his skin conditions were treated with topical creams and ointments. Ex. 1 at 252-61, 181-86. His symptoms waxed and waned throughout the month of February and began appearing more inflamed and oozed at times, leading to another ER visit. *Id.* at 187, 189, 227-31. However, the assessments

---

[3] In citing exhibits in this Decision, I am following Respondent's convention as set forth in his Rule 4(c) Report. *See* Mot. at 2 n.1.

remained the same (and there is no evidence any treater associated H.G.'s skin condition with vaccination). By late March, Petitioner took H.G. to an allergist, reporting her view at this time that H.G.'s eczema was prompted by a vaccine (while also identifying its onset to when he was five-months old, or before January 2015). *Id.* at 198-200. The allergist proposed dietary changes aimed at helping H.G. avoid foods to which he might be allergic, and otherwise proposed further eczema treatment. *Id.*

In mid-April 2015, at a nine-month well child pediatric visit, H.G. was assessed with "possible slight gross motor delay," and his existing history of atopic dermatitis/eczema was also evaluated. Ex. 1 at 135-37. By his July 2015 one-year pediatric visit, his developmental delay was more obvious (although Petitioner deemed it a byproduct of his eczema). *Id.* at 142-44. At his nine-month visit he was assessed as only possessing "mild expressive speech delay." *Id.* at 145-47. By February 2016, however, H.G. was considered to present sufficient developmental and speech delay to place him on the autism spectrum, and he was recommended for early intervention. *Id.* at 158-60. Since then, he has formally been diagnosed with an ASD. *Id.* at 167-69, 173-74.

In the same overall time period, H.G. has continued to receive a variety of treatments for his eczema/atopic dermatitis. He returned to the allergist several times, where treatment focus was on eliminating foods from his diet to which he appeared to react. Ex. 1 at 201-03 (April 2015 visit), 204-05 (June 2015 visit), 207-08 (August 2015 visit), 210-11 (March 2016 visit). By the time he was nearly twenty months old, it appeared his allergies had sufficiently resolved to permit him to normalize his diet. *Id.* at 21011. H.G. also received homeopathic treatments between June 2015 and September 2017. *Id.* at 262-64.

## II. Parties' Respective Arguments

In his Rule 4 (c) Report, Respondent formally moves for dismissal of the case. He argues that the part of Petitioner's claim based on H.G.'s eczema/atopic dermatitis fails because the record suggests onset of that condition predated the January 2015 vaccinations. Mot. at 9 (citing Ex. 1 at 124-26, 127,28, 179-80, 227-31). He also notes that claims that vaccines cause autism have been thoroughly debunked after the Vaccine Program's Omnibus Autism Proceeding,[4] and that no

---

[4] Several years ago, more than 5,400 cases were initially filed under short form petition in the OAP, where thousands of petitioners' claims that certain vaccines caused autism were joined for purposes of efficient resolution. A "Petitioners' Steering Committee" was formed by many attorneys who represent Vaccine Program petitioners, with about 180 attorneys participating. This group chose "test" cases to represent the entire docket, with the understanding that the outcomes in these cases would be applied to cases with similar facts alleging similar theories.

The Petitioners' Steering Committee chose six test cases to present two different theories regarding autism causation. The first theory alleged that the measles portion of the measles, mumps, rubella ("MMR") vaccine precipitated autism, or, in the alternative, that MMR plus thimerosal-containing vaccines caused autism, while the second theory alleged that the mercury contained in thimerosal-containing vaccines could affect an infant's brain, leading to autism.

3

subsequent non-Table decisions in such cases have been favorable to petitioners. Mot. at 9-10 (citations omitted). Respondent also maintains that Petitioner has offered no reliable scientific or medical evidence that would link H.G.'s skin conditions with the manifestation of his developmental problems that later resulted in an ASD diagnosis. *Id.* at 9.

Petitioner's opposition is mostly devoted to an extensive review of H.G.'s medical history, including periods of time well outside of the months after vaccination. *See* Opp. at 1-16. She makes some attempt to rebut records suggesting H.G.'s skin condition began before mid-January 2015, although that effort largely consists of her own unsworn assertions; she also contends that certain skin problems observed with respect to H.G., such as diaper rash, are distinguishable from her actual claim. *Id.* at 3-5. She then proposes her own causation theory (unsupported by an expert report) which proposes a multi-factorial explanation for how the vaccines could have injured H.G., including their components, via "mitochondrial dysfunctions affecting his detoxification pathways," and an interaction between alum added to some of the vaccines as an adjuvant and an inborn inability of H.G. to detoxify, evidenced by his skin condition and later producing a brain injury. *Id.* at 16-17. Petitioner cites, but did not file, twenty-nine items of literature or medical sources in support of her contentions, a majority of which deal with autism. *Id.* at 19-23.

## III. Applicable Legal Standards

### A. Claimant's Burden in Vaccine Program Cases

To receive compensation in the Vaccine Program, a petitioner must prove either: (1) that he suffered a "Table Injury" – i.e., an injury falling within the Vaccine Injury Table – corresponding to one of the vaccinations in question within a statutorily prescribed period of time

---

The first theory was rejected in three test case decisions, all of which were subsequently affirmed. *See generally Cedillo v. Sec'y of Health & Human Servs.*, No. 98-916V, 2009 WL 331968 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *mot. for review den'd*, 89 Fed. Cl. 158 (2009), *aff'd*, 617 F.3d 1328 (Fed. Cir. 2010); *Hazlehurst v. Sec'y of Health & Human Servs.*, No. 03-654V, 2009 WL 332306 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *mot. for review den'd*, 88 Fed. Cl. 473 (2009), *aff'd*, 605 F.3d 1343 (Fed. Cir. 2010); *Snyder v. Sec'y of Health & Human Servs.*, No. 01-162V, 2009 WL 332044 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd*, 88 Fed. Cl. 706 (2009).

The second theory was similarly rejected. *Dwyer v. Sec'y of Health & Human Servs.*, No. 03-1202V, 2010 WL 892250 (Fed. Cl. Spec. Mstr. Mar. 12, 2010); *King v. Sec'y of Health & Human Servs.*, No. 03-584V, 2010 WL 892296 (Fed. Cl. Spec. Mstr. Mar. 12, 2010); *Mead v. Sec'y of Health & Human Servs.*, No. 03-215V, 2010 WL 892248 (Fed. Cl. Spec. Mstr. Mar. 12, 2010).

Ultimately a total of eleven lengthy decisions by special masters, the judges of the U.S. Court of Federal Claims, and the panels of the U.S. Court of Appeals for the Federal Circuit, unanimously rejected petitioners' claims. These decisions found no persuasive evidence that the MMR vaccine or thimerosal-containing vaccines caused autism. The OAP proceedings concluded in 2010.

4

or, in the alternative, (2) that his illnesses were actually caused by a vaccine (a "Non-Table Injury"). *See* Sections 13(a)(1)(A), 11(c)(1), and 14(a), as amended by 42 C.F.R. § 100.3; § 11(c)(1)(C)(ii)(I); *see also Moberly v. Sec'y of Health & Human Servs.*, 592 F.3d 1315, 1321 (Fed. Cir. 2010); *Capizzano v. Sec'y of Health & Human Servs.*, 440 F.3d 1317, 1320 (Fed. Cir. 2006).[5] Here, Petitioner alleges only a non-table injury.

For both Table and Non-Table claims, Vaccine Program petitioners bear a "preponderance of the evidence" burden of proof. Section 13(1)(a). That is, a petitioner must offer evidence that leads the "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." *Moberly*, 592 F.3d at 1322 n.2; *see also Snowbank Enter. v. United States*, 6 Cl. Ct. 476, 486 (1984) (mere conjecture or speculation is insufficient under a preponderance standard). Proof of medical certainty is not required. *Bunting v. Sec'y of Health & Human Servs.*, 931 F.2d 867, 873 (Fed. Cir. 1991). In particular, a petitioner must demonstrate that the vaccine was "not only [the] but-for cause of the injury but also a substantial factor in bringing about the injury." *Moberly*, 592 F.3d at 1321 (quoting *Shyface v. Sec'y of Health & Human Servs.*, 165 F.3d 1344, 1352-53 (Fed. Cir. 1999)); *Pafford v. Sec'y of Health & Human Servs.*, 451 F.3d 1352, 1355 (Fed. Cir. 2006). A petitioner may not receive a Vaccine Program award based solely on his assertions; rather, the petition must be supported by either medical records or by the opinion of a competent physician. Section 13(a)(1).

In attempting to establish entitlement to a Vaccine Program award of compensation for a Non-Table claim, a petitioner must satisfy all three of the elements established by the Federal Circuit in *Althen v. Sec'y of Health & Human Servs.*, 418 F.3d 1274, 1278 (Fed. Cir. 2005): "(1) a medical theory causally connecting the vaccination and the injury; (2) a logical sequence of cause and effect showing that the vaccination was the reason for the injury; and (3) a showing of a proximate temporal relationship between vaccination and injury." *Althen*, 418 F.3d at 1278.

Each of the *Althen* prongs requires a different showing. Under *Althen* prong one, petitioners must provide a "reputable medical theory," demonstrating that the vaccine received *can cause* the type of injury alleged. *Pafford*, 451 F.3d at 1355-56 (citations omitted). To satisfy this prong, a petitioner's theory must be based on a "sound and reliable medical or scientific explanation." *Knudsen v. Sec'y of Health & Human Servs.*, 35 F.3d 543, 548 (Fed. Cir. 1994). Such a theory must only be "legally probable, not medically or scientifically certain." *Id.* at 549.

---

[5] Decisions of special masters (some of which I reference in this ruling) constitute persuasive but not binding authority. *Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998). By contrast, Federal Circuit rulings concerning legal issues are binding on special masters. *Guillory v. Sec'y of Health & Human Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd*, 104 F. App'x 712 (Fed. Cir. 2004); *see also Spooner v. Sec'y of Health & Human Servs.*, No. 13-159V, 2014 WL 504728, at *7 n.12 (Fed. Cl. Spec. Mstr. Jan. 16, 2014).

5

Petitioners may satisfy the first *Althen* prong without resort to medical literature, epidemiological studies, demonstration of a specific mechanism, or a generally accepted medical theory. *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1378-79 (Fed. Cir. 2009) (citing *Capizzano*, 440 F.3d at 1325-26). Special masters, despite their expertise, are not empowered by statute to conclusively resolve what are essentially thorny scientific and medical questions, and thus scientific evidence offered to establish *Althen* prong one is viewed "not through the lens of the laboratorian, but instead from the vantage point of the Vaccine Act's preponderant evidence standard." *Id.* at 1380. Accordingly, special masters must take care not to increase the burden placed on petitioners in offering a scientific theory linking vaccine to injury. *Contreras v. Sec'y of Health & Human Servs.*, 121 Fed. Cl. 230, 245 (2015) ("[p]lausibility . . . in many cases *may* be enough to satisfy *Althen* prong one" (emphasis in original)), *vacated on other grounds*, 844 F.3d 1363 (Fed. Cir. 2017); *see also Andreu*, 569 F.3d at 1375. But this does not negate or reduce a petitioner's ultimate burden to establish his overall entitlement to damages by preponderant evidence. *W.C. v. Sec'y of Health & Human Servs.*, 704 F.3d 1352, 1356 (Fed. Cir. 2013) (citations omitted).

The second *Althen* prong requires proof of a logical sequence of cause and effect, usually supported by facts derived from a petitioner's medical records. *Althen*, 418 F.3d at 1278; *Andreu*, 569 F.3d at 1375-77; *Capizzano*, 440 F.3d at 1326; *Grant v. Sec'y of Health & Human Servs.*, 956 F.2d 1144, 1148 (Fed. Cir. 1992). In establishing that a vaccine "did cause" injury, the opinions and views of the injured party's treating physicians are entitled to some weight. *Andreu*, 569 F.3d at 1367; *Capizzano*, 440 F.3d at 1326 ("medical records and medical opinion testimony are favored in vaccine cases, as treating physicians are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury'") (quoting *Althen*, 418 F.3d at 1280). Medical records are generally viewed as particularly trustworthy evidence, since they are created contemporaneously with the treatment of the patient. *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

However, medical records and/or statements of a treating physician's views do not *per se* bind the special master to adopt the conclusions of such an individual, even if they must be considered and carefully evaluated. Section 13(b)(1) (providing that "[a]ny such diagnosis, conclusion, judgment, test result, report, or summary shall not be binding on the special master or court"); *Snyder v. Sec'y of Health & Human Servs.*, 88 Fed. Cl. 706, 746 n.67 (2009) ("there is nothing . . . that mandates that the testimony of a treating physician is sacrosanct – that it must be accepted in its entirety and cannot be rebutted"). As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases. The views of treating physicians should also be weighed against other, contrary evidence also present in the record – including conflicting opinions among such individuals. *Hibbard v. Sec'y of Health & Human Servs.*, 100 Fed. Cl. 742, 749 (2011)

(not arbitrary or capricious for special master to weigh competing treating physicians' conclusions against each other), *aff'd*, 698 F.3d 1355 (Fed. Cir. 2012); *Caves v. Sec'y of Health & Human Servs.*, 100 Fed. Cl. 119, 136 (2011), *aff'd*, 463 F. App'x 932 (Fed. Cir. 2012); *Veryzer v. Sec'y of Health & Human Servs.*, No. 06-522V, 2011 WL 1935813, at *17 (Fed. Cl. Spec. Mstr. Apr. 29, 2011), *mot. for review den'd*, 100 Fed. Cl. 344, 356 (2011), *aff'd without opinion*, 475 Fed. App'x 765 (Fed. Cir. 2012).

The third *Althen* prong requires establishing a "proximate temporal relationship" between the vaccination and the injury alleged. *Althen*, 418 F.3d at 1281. That term has been equated to the phrase "medically-acceptable temporal relationship." *Id.* A petitioner must offer "preponderant proof that the onset of symptoms occurred within a timeframe which, given the medical understanding of the disorder's etiology, it is medically acceptable to infer causation." *Bazan v. Sec'y of Health & Human Servs.*, 539 F.3d 1347, 1352 (Fed. Cir. 2008). The explanation for what is a medically acceptable timeframe must also coincide with the theory of how the relevant vaccine can cause an injury (*Althen* prong one's requirement). *Id.* at 1352; *Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 532, 542 (2011), *recons. den'd after remand*, 105 Fed. Cl. 353 (2012), *aff'd mem.*, 2013 WL 1896173 (Fed. Cir. 2013); *Koehn v. Sec'y of Health & Human Servs.*, No. 11-355V, 2013 WL 3214877 (Fed. Cl. Spec. Mstr. May 30, 2013), *mot. for review den'd* (Fed. Cl. Dec. 3, 2013), *aff'd*, 773 F.3d 1239 (Fed. Cir. 2014).

## B.    Law Governing Factual Determinations

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records. Section 11(c)(2). The special master is required to consider "all [] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions." Section 13(b)(1)(A). The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such a determination is evidenced by a rational determination).

Medical records that are created contemporaneously with the events they describe are presumed to be accurate and "complete" (i.e., presenting all relevant information on a patient's health problems). *Cucuras*, 993 F.2d at 1528; *Doe/70 v. Sec'y of Health & Human Servs.*, 95 Fed. Cl. 598, 608 (2010) ("[g]iven the inconsistencies between petitioner's testimony and his contemporaneous medical records, the special master's decision to rely on petitioner's medical

7

records was rational and consistent with applicable law"), *aff'd, Rickett v. Sec'y of Health & Human Servs.*, 468 F. App'x 952 (Fed. Cir. 2011) (non-precedential opinion). This presumption is based on the linked propositions that (i) sick people visit medical professionals; (ii) sick people honestly report their health problems to those professionals; and (iii) medical professionals record what they are told or observe when examining their patients in as accurate a manner as possible, so that they are aware of enough relevant facts to make appropriate treatment decisions. *Sanchez v. Sec'y of Health & Human Servs.*, No. 11-685V, 2013 WL 1880825, at *2 (Fed. Cl. Spec. Mstr. Apr. 10, 2013); *Cucuras v. Sec'y of Health & Human Servs.*, 26 Cl. Ct. 537, 543 (1992), *aff'd*, 993 F.2d 1525 (Fed. Cir. 1993) ("[i]t strains reason to conclude that petitioners would fail to accurately report the onset of their daughter's symptoms. It is equally unlikely that pediatric neurologists, who are trained in taking medical histories concerning the onset of neurologically significant symptoms, would consistently but erroneously report the onset of seizures a week after they in fact occurred").

Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). Indeed, contemporaneously medical records are generally found to be deserving of greater evidentiary weight than oral testimony – especially where such testimony conflicts with the record evidence. *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir.), *cert. den'd, Murphy v. Sullivan*, 506 U.S. 974 (1992) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1947) ("[i]t has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight.")).

However, there are situations in which compelling oral testimony may be more persuasive than written records, such as where records are deemed to be incomplete or inaccurate. *Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("[w]ritten records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent") (quoting *Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed. Cir. 1992)). Ultimately, a determination regarding a witness's credibility is needed when determining the weight that such testimony should be afforded. *Andreu*, 569 F.3d at 1379; *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling." *Sanchez*, 2013 WL 1880825, at *3 (citing *Blutstein v. Sec'y of Health & Human*

8

*Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014). In making a determination regarding whether to afford greater weight to contemporaneous medical records over contrary testimony, there must be evidence that this decision was the result of a rational determination. *Burns*, 3 F.3d at 417.

### C.     Determination to Resolve Case Without Hearing

I have opted to decide entitlement in this case based on written submissions and evidentiary filings filed by each side. The Vaccine Act and Rules not only contemplate but encourage special masters to decide petitions on the papers rather than via evidentiary hearing, where (in the exercise of their discretion) they conclude that the former means of adjudication will properly and fairly resolve the case. Section 12(d)(2)(D); Vaccine Rule 8(d). The choice to do so has been affirmed on appeal. *See Hooker v. Sec'y of Health & Human Servs.*, No. 02-472V, 2016 WL 3456435, at *21 n.19 (Fed. Cl. Spec. Mstr. May 19, 2016) (citing numerous cases where special masters decided on the papers in lieu of hearing and that decision was upheld). I am simply not required to hold a hearing in every matter, no matter the preferences of the parties. *Hovey v. Sec'y of Health & Human Servs.*, 38 Fed. Cl. 397, 402-03 (1997) (special master acted within his discretion in denying evidentiary hearing); *Burns*, 3 F.3d at 417; *Murphy v. Sec'y of Health & Human Servs.*, No. 90-882V, 1991 WL 71500, at *2 (Ct. Cl. Spec. Mstr. Apr. 19, 1991).

## ANALYSIS

After careful review of the medical records and Petitioner's filings, I conclude that Petitioner will not be able to establish preponderant evidence in favor of her claim, and therefore the matter should not proceed. My decision is rooted in both the facts of this case as well as applicable decisions in previously-litigated matters involving causation theories highly similar to the present, and which have been exhaustively litigated since resolution of the OAP test cases.

First, I find that Petitioner's claim that H.G.'s eczema and atopic dermatitis was induced by vaccination is not well-supported by the record. In particular, it appears more likely than not that onset of those conditions *preceded* vaccination, making it impossible to establish vaccine causation. Petitioner's efforts to distinguish records that place onset as before vaccination were not persuasive, relying on her own *ipse dixit* statements rather than independent evidence. It is

9

well-understood in the Program (as noted above) that contemporaneous records are presumptively accurate, absent a specific showing by a party that credibly establishes why the record should be supplemented. *See, e.g., Cucuras*, 993 F.3d at 1528 ("[O]ral testimony in conflict with contemporaneous documentary evidence deserves little weight"); *Murphy*, 23 Cl. Ct. at 733 (citing *United States v. Gypsum Co.*, 333 U.S. 364, 396 (1947)); *Lowrie*, 2005 WL 6117475, at *19. But in this case Petitioner has not made that showing. She otherwise has not offered any persuasive scientific evidence that (assuming onset *was* after vaccination) suggests the vaccines in question could induce skin conditions of the sort H.G. experienced, and if so how this would occur,[6] and had no expert to testify on that matter.

Second, Petitioner's primary claim – that the vaccines H.G. received caused his ASD – is even more fundamentally flawed. Unlike many autism claims, Petitioner does not argue that H.G. suffered an encephalopathic reaction close-in-time to his vaccinations, nor is there any evidence of such a reaction, and she does not seek to establish a Table claim of encephalopathy occurring after vaccination.[7] She instead advances a complex theory in which some kind of inborn susceptibility or metabolism error caused H.G. to have difficulty clearing "toxins," which was manifested by his skin condition, but also resulted in alum (contained in the vaccines) being stored in his brain, resulting in his ASD. Opp.at 16-17.

But non-Table claims that vaccines induce autism have repeatedly failed in the Program. *See, e.g., Hardy v. Sec'y of Health & Human Servs.*, No. 08-108V, 2015 WL 7732603, at *4-5 (Fed. Cl. Spec. Mstr. Nov. 3, 2015) (referencing eleven autism claims unsuccessfully tried, plus six that were rejected (over the petitioners' objections) without trial). Petitioner's theory takes bits and pieces from such previously rejected causation theories – the idea that vaccine adjuvants poison the brain, or that mitochondrial dysfunction results in developmental problems. There is no reason to expect the present theory would be any more successful. Thus, because Petitioner has not presented a reliable medical or scientific theory establishing how H.G.'s ASD was vaccine-caused (and indeed – given existing well-reasoned Program decisions, virtually *could not* succeed in the task of establishing a vaccine could cause autism), she cannot satisfy the first, "can cause" prong.

---

[6] As already noted, Petitioner referenced, but did not file, several items of literature, some of which might arguably (if a competent medical expert had appeared to unify and explain their import) have supported her contentions about an association between the relevant vaccines and skin injuries of the sort experienced by H.G. But her failure to file these items means that they literally are *not* in the record before me – and thus inherently receive far less weight than they might otherwise have been given.

[7] In two rare instances, petitioners have succeeded in establishing a Table encephalopathy caused by vaccinations which in turn resulted in developmental plateauing or regression that resembled the symptoms of an ASD. *See, e.g., Wright v. Sec'y of Health & Human Servs.*, No. 12-423V, 2015 WL 6665600 (Fed. Cl. Spec. Mstr. Sept. 21, 2015); *Poling v. Sec'y of Health & Human Servs.*, No. 02-1466V, 2011 WL 678559, at *1 (Fed. Cl. Spec. Mstr. Jan. 28, 2011). But the facts of this case do not at all support such a contention, as H.G. is only alleged to have manifested skin problems post-vaccination rather than the kinds of symptoms required to establish a Table encephalopathy. *See* 42 C.F.R. § 100.3.

Petitioner's claim also fails on the second *Althen* prong – and would do so even if she had supported her theory with some new scientific evidence reliably establishing a connection between vaccination and autism. *Sturdivant v. Sec'y of Health & Human Servs.*, No. 07-788V, 2016 WL 552529, at *18 (Fed. Cl. Spec. Mstr. Jan. 21, 2016) (prong two requires a fact-based inquiry into whether the vaccine in question *did* cause the particular injury). The medical record is bereft of reliable evidence that H.G. had any reaction to his January 2015 vaccines, that the skin condition (which more likely preceded vaccination) was a vaccine reaction, or that his ASD symptoms can be connected to vaccination in any way other than temporally. Nor did any treaters suggest it to be otherwise.[8]

## CONCLUSION

The factual record does not support the Petitioner's contention that H.G.'s skin condition was vaccine-caused, and she cannot prevail on a theory that any vaccine *could* cause autism, whether directly or in association with a case of dermatitis or eczema. Thus, Petitioner has not established entitlement to a damages award, and I must **DISMISS** her claim.

In the absence of a timely-filed motion for review (see Appendix B to the Rules of the Court), the Clerk **SHALL ENTER JUDGMENT** in accordance with this decision.[9]

**IT IS SO ORDERED.**

Brian H. Corcoran
Special Master

---

[8] I also find that Petitioner has not established, under *Althen* prong three, that the timeframe from vaccination to manifestation of H.G.'s ASD symptoms was medically reasonable. The earliest any such symptoms were raised with treaters was April 2015, three months post-vaccination. Petitioner has not adequately explained in her brief (unsupported by filed medical literature or an expert opinion) why it would take that length of time for injury to occur, nor has she temporally associated H.G.'s earlier skin symptoms to the subsequent revelation of his developmental delay.

[9] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.